892 P.2d 468

Andres BUMANGLAG, Claimant–
Appellee,

v.

OAHU SUGAR COMPANY, LTD., Em-
ployer–Appellant, Self–Insured, and Ac-
clamation Insurance Management Ser-
vices, Insurance Adjuster–Appellant, and
Special Compensation Fund, Appellee.

No. 16591.

Supreme Court of Hawai'i.

April 6, 1995.

Roland Q.F. Thom (Laurie E. Keeno, with him on the briefs; of Char, Hamilton, Campbell & Thom), Honolulu, for employer-appellant, self-insured, and ins. adjuster-appellant.

Robin M. Kuwabe and Wayne A. Matsuura, Deputy Attys. Gen., on the briefs, Honolulu, for claimant-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Employer–Appellant Oahu Sugar Company (Employer) and Insurance Adjuster–Appellant Acclamation Insurance Management Services (Adjuster) appeal the Decision and Order of the Labor and Industrial Relations Appeals Board (Board) holding that the permanent partial disability benefits of Claimant–Appellee Andres Bumanglag (Claimant) cannot be apportioned with the Appellee Special Compensation Fund (SCF). Employer and Adjuster argue that the Board erred in concluding that Claimant did not have a preexisting partial disability of thirty-two weeks of compensation necessary to warrant apportionment between Employer and the SCF as required by Hawai'i Revised Statutes (HRS) § 386–33 (1985). Because the Board's findings of fact (FOF) are not clearly erroneous and its conclusions of law (COL) are correct, we affirm the Board's Decision and Order.

## I. FACTS

Claimant was born on February 4, 1930, in the Philippines. He completed formal education through the tenth grade and began working on a farm. Claimant moved to Hawai'i in 1967 and accepted a job with Employer in 1968. He continued to work for Employer in labor-intensive positions until his industrial accident in 1985.

On June 17, 1985, Claimant suffered a lower back injury while working for Employer. Employer accepted liability and Claimant thereafter sought medical treatment for his injury. On September 28, 1985, Claimant suffered a recurrence of the June 17, 1985 lower back injury. Once more, Employer accepted liability and paid for Claimant's medical treatment.

On August 27, 1985, Marsha Mark, M.D., initially diagnosed Claimant's injury as a lumbosacral strain; she attributed this injury solely to Claimant's June 17, 1985 work-related accident. In addition, Dr. Mark noted that the Claimant had "full [range of motion]" upon examination.

On November 20, 1985, Claimant received a computated tomography (CT) scan on his lumbosacral spine. The report indicated a very mild posterior bulge of the L4–5 disc that was of doubtful significance. Subsequent electromyogram studies showed mild left L4–5 nerve root irritation. Claimant's then treating physician, C.P. Lau, M.D., re-examined Claimant with a diagnosis of back strain and radiculitis and advised him to continue light duty.

On April 17, 1986, Rowlin Lichter, M.D., examined Claimant and noted that Claimant had no prior history of back pain or back injury and had always been in good health. After conducting a physical examination and reviewing the November 20, 1985 CT scan, Dr. Lichter rated Claimant's permanent impairment at 5 percent for his disc disruption, 2.5 percent for loss of motion, and an additional 2 percent for the lower extremity weakness. Dr. Lichter also observed that Claimant was able to extend 30 degrees, thus giving him a zero percent impairment for extension.

On May 29, 1986, Thomas Sakoda, M.D., became involved with the case. After reviewing Claimant's November 20, 1985 CT scan, Dr. Sakoda was of the opinion that Claimant may have had a very large herniated disk at L4–5 but recommended a myelogram to further evaluate Claimant's condition.

After reviewing the myelogram results, Dr. Sakoda reported:

> [Claimant] had a very narrow canal. The entire spine was stenotic. He had also [a] definite disk rupture at L4–5 or what appeared to be a significantly bulging disk in the midline at L4–5. It was felt that most likely a stenosis of the canal with a small disk herniation which accounted for his complaints.

Upon discharge after the myelogram, Claimant was diagnosed with a herniated lumbar disk and spinal stenosis.

In light of the results of Claimant's myelogram, Dr. Sakoda recommended that Claimant enter a vocational training program or seek surgical treatment. Not wanting to undergo surgical treatment, Claimant was sent to Comprehensive Health and Rehabilitation Training for vocational rehabilitation. Because the labor market did not offer Claimant any options, given his age, transferable skills, experience, and physical limitations, Claimant was deemed an infeasible candidate for vocational training, and eventually his case was closed.

On March 22, 1988, Dr. Lichter again examined Claimant. Dr. Lichter strongly advised against surgical intervention because, in his opinion, Claimant's pain was attributable to a significant psychiatric component. In light of Dr. Lichter's observations, Francy Mateus, M.D., conducted a psychiatric evaluation of Claimant and concluded the Claimant did not suffer from a mental disorder.

Another CT scan was conducted on July 21, 1988. The radiologist who read Claimant's second CT scan noted: "No evidence of frank disk herniation. Mild circumferential bulging of the L4–5 disc. Mild spinal stenosis at the L4–5 level."

On July 26, 1988, a hearing was held at the Disability Compensation Division (DCD) of the Department of Labor and Industrial Relations (DLIR). By Decision dated September 16, 1988, the Director of the DLIR determined that Claimant sustained a recurrence of his June 17, 1985 injury on September 28, 1985. The Director awarded temporary total disability for various periods in 1985 through April 2, 1988, aggregating 73 weeks and 5 days, for a total of $17,179.09. The Director also indicated that additional temporary total disability from April 13, 1988 might be authorized upon submission of sustaining medical evidence. The extent of temporary partial disability and permanent disability, if any, was to be determined at a later date.

On November 10, 1988, Claimant was examined by Kurt A. Mariano, D.C., at the request of Claimant's attorney. Dr. Mariano opined that Claimant's work-related injuries had aggravated Claimant's spinal stenosis and rated Claimant at 15 percent for the whole person and 5 percent for the left lower extremity.

On September 5, 1990, another hearing was held at the DCD. By Supplemental Decision dated October 26, 1990, the Director of the DLIR consolidated the September 28, 1985 claim (Case No. 2–85–24709) with the June 17, 1985 claim (Case No. 2–85–16255). In addition, the Director awarded the following: (1) additional temporary total disability from April 13, 1988 through September 5, 1990 for 125 weeks and one day, for a total of $29,164.55; (2) 15 percent permanent partial disability of the whole person and 5 percent permanent partial disability of the left lower extremity, beginning September 5, 1990, for 72.8372 weeks, for a total of $16,974.72. Claimant timely appealed the Supplemental Decision on November 5, 1990 to the Board.

At the request of SCF, Stephen Hirasuna, M.D., performed a records review on Claimant. Dr. Hirasuna opined:

> After reviewing [Claimant's] record, it appears that [Claimant] has a congenital spinal stenosis which has been made symptomatic by the bulging of the L4–5 disc. Since the canal is already small, the bulging disc, the mild bulge of the L4–5 disc is more significant than it would normally be.

> Based on reasonable medical probability, it appears that [Claimant] did have a ratable disability for the industrial incidents of 6/17/85 and 9/28/85.

However, Dr. Hirasuna indicated no rating for Claimant's congenital spinal stenosis.

On April 13, 1991, John Hendrickson, Jr., M.D., examined Claimant of behalf of Employer. In his report, Dr. Hendrickson noted that "[Claimant] had no prior history of back pain or injuries." In addition, Dr. Hendrickson reported that "[Claimant] undoubtedly has ligamentum flavum and medial facet indentation in combination with an anterior disk bulge and a congenitally narrowed canal resulting in nerve and root compression."[1]

---

1. Dr. Hendrickson testified that hypertrophy of the facets and ligamentum flavum were degener-

Basing his responses on reasonable medical probability and the American Medical Association (AMA) Guide, Dr. Hendrickson opined:

> Although the patient had a preexisting congenital condition of spinal stenosis apparently involving the entire spinal canal, he was asymptomatic for this condition until the internal disk derangement incurred on 6/17/85. *His current impairment is thus attributed 100% to this injury.*

(Emphasis added.) Because Dr. Hendrickson reported that Claimant's injuries were not apportionable, Employer's attorney met with Dr. Hendrickson to discuss alleged flaws in Dr. Hendrickson's original opinion. After the meeting with Employer's attorney, Dr. Hendrickson departed from his original opinion and took a new position that 20 to 25 percent of Claimant's overall impairment after the accident was attributable to Claimant's preexisting congenital defects. Because the AMA Guide did not rate asymptomatic unoperated spinal stenosis, Dr. Hendrickson based this new opinion on his "best guess."

On July 1, 1991, the Board held a hearing to determine the period of Claimant's temporary total disability, the extent of permanent disability, and apportionment of permanent disability between Employer and the SCF. In their argument before the Board, Employer and Adjuster asserted that Claimant's permanent disability must be apportioned between Employer and SCF, because Claimant's congenital defects of spinal stenosis and hypertrophy of the facets and ligamentum flavum were significant preexisting medical conditions sufficient to meet the threshold requirements for apportionment under HRS § 386–33.

The SCF contended that unoperated canal stenosis is not a rateable impairment under the AMA Guide, and even assuming that it was, based on the impairment ratings in the record, Claimant did not have a preexisting permanent partial disability sufficient to support an award of thirty-two weeks as required by HRS § 386–33 (1985).

The Board issued its Proposed Decision and Order on September 16, 1992. Employer and Adjuster filed their Exceptions to Proposed Decision and Order on September 29, 1992.

In its Decision and Order dated October 6, 1992, the Board awarded Claimant additional temporary total disability from April 13, 1988 through July 17, 1989. The Board also concluded Claimant was permanently and totally disabled effective July 18, 1989. Finally, the Board determined Employer to be entirely liable for Claimant's permanent total disability pursuant to HRS § 386–31(a). In Conclusion of Law (COL) 3, the Board stated:

> We conclude that Claimant's permanent total disability benefits shall not be apportioned with the SCF. We find no evidence in the record to conclude that Claimant had a pre-existing permanent partial disability sufficient to support an award of thirty-two (32) weeks of compensation, pursuant to HRS § 386–33. In this case we are unable to credit Dr. John Hendrickson's July 1, 1991 opinion. Even if we were to accept Dr. Hendrickson's opinion as to Claimant's preexisting impairment for his low back condition, and apply it to the highest permanent impairment rating for the lumbar region (11% of the whole person), 20 to 25% of 11% would provide, at most, 2.75% pre-existing permanent partial disability of the whole person. Permanent partial disability of 2.75% of the whole person is equal to 10.71 weeks of compensation at Claimant's weekly benefits rate of $233.05.... It has not been shown that Claimant has a pre-existing permanent partial disability of 32 weeks of compensation necessary to warrant apportionment with SCF. Accordingly, Employer shall pay for Claimant's permanent total disability benefits pursuant to HRS § 386–31(a).[2]

---

ative conditions that took years to develop.

2. We note that COL 3 includes the factual finding that Dr. Hendrickson's testimony should not be credited. Although the FOF was denominated a COL, the determination whether Dr. Hendrickson's testimony was credible is binding upon this court as an FOF. *Molokoa Village Dev. Co., Ltd. v. Kauai Elec. Co., Ltd.,* 60 Haw. 582, 593 P.2d 375 (1979) (holding that FOF, which may not be set aside unless clearly erroneous, is not freely reviewable by reason of its label as COL).

Thereafter, Employer and Adjuster filed a timely Notice of Appeal.

## II. *STANDARD OF REVIEW*

Appellate review of the Board's decision is governed by HRS § 91–14(g), which provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1985).

[A]ppeals taken from findings [of fact] set forth in decisions of the Board are reviewed under the clearly erroneous standard. Thus, this court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.] The clearly erroneous standard requires this court to sustain the Board's findings unless the court is left with a firm and definite conviction that a mistake has been made.

A conclusion of law . . . is not binding on an appellate court and is freely reviewable for its correctness. Thus, this court reviews [conclusions of law] *de novo*, under the right/wrong standard.

*Tate v. GTE Hawaiian Tel. Co.*, 77 Hawai'i 100, 102–03, 881 P.2d 1246, 1248–49 (1994) (internal citations, internal quotation marks, and footnote omitted).

## III. *DISCUSSION*

### A.

Employer and Adjuster contend that the Board was clearly erroneous in finding that Claimant's prior medical conditions did not amount to a preexisting disability necessary to warrant an apportionment of liability with the SCF. We disagree.

Apportionment of subsequent injuries is governed by HRS § 386–33 (1985), which provides in pertinent part:

(a) Where prior to any injury an employee suffers from a *previous permanent partial disability already existing prior to the injury for which compensation is claimed,* and *the disability resulting from the injury combines with the previous disability,* whether the previous permanent partial disability was incurred during past or present periods of employment, *to result in a greater* permanent partial disability or *in permanent total disability* or in death then weekly benefits shall be paid as follows:

. . . .

(2) In cases where the disability resulting from the injury combines with the previous disability to result in permanent total disability the employer shall pay the employee for one hundred four weeks and thereafter compensation for permanent total disability shall be paid out of the special compensation fund;

. . . .

(b) Subsection (a) to the contrary notwithstanding, *where the director or the appellate board determines that the previous permanent partial disability amounted to less than that necessary to support an award of thirty-two weeks of compensation for permanent partial disability there shall be no liability on the special compensation fund,* and in any such case the employer shall pay the employee or the employee's dependents full compensation for the employee's actual permanent partial or total disability or death.

(Emphases added.)

■■■ In construing HRS § 386–33, our foremost responsibility "is to ascertain and

give effect to the intention of the legislature[,]" obtained primarily from the language itself. *State v. Mezurashi*, 77 Hawai'i 94, 97, 881 P.2d 1240, 1243 (1994) (citation and internal quotation marks omitted). Further, we must read the statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. *Id.* Where the statutory language is plain and unambiguous, our only duty is to give effect to statute's plain and obvious meaning. *Id.*

■ We understand the language of HRS § 386–33(a) to mean that in order to obtain an apportionment with SCF, Employer must first prove three conditions: (1) that Claimant suffered from a preexisting permanent partial disability; (2) that the preexisting permanent partial disability was capable of supporting an award of thirty-two weeks of compensation;[3] and (3) that the preexisting disability and the subsequent work-related injury combined into a greater present disability.

Thus, the outcome-dispositive issue here is whether the Board was clearly erroneous in finding that Claimant did not suffer from a preexisting permanent partial disability capable of supporting an award of thirty-two weeks of compensation.

■ Subsection (b) of HRS § 386–33 authorizes the director or the appellate board to apportion liability with SCF if the Director or Board determines that the previous permanent partial disability amounted to an award of thirty-two weeks of compensation. Employer and Adjuster contend that Claimant's congenital defects of canal stenosis and hypertrophy of the facets and ligamentum flavum were significant medical conditions amounting to an award of thirty-two weeks of compensation.

In the instant case, Dr. Hendrickson initially stated that the apportionment should be 100 percent to the industrial accident. This first opinion was based upon reasonable medical probability and the AMA Guide. However, after meeting with Employer's attorney, Dr. Hendrickson departed from this original opinion and took a new position that 20 to 25 percent of Claimant's overall impairment after the accident was attributable to Claimant's preexisting congenital defects. This second opinion was not based on the AMA Guide but on his own "best guess."

Regardless of this change in position, the Board noted that, "[e]ven if we were to accept Dr. Hendrickson's opinion as to Claimant's pre-existing impairment for his low back condition, and apply it to the highest permanent impairment rating for the lumber region (11 [percent] of the whole person), 20 to 25 [percent] of 11 [percent] would provide, at most, 2.75 [percent] pre-existing permanent partial disability of the whole person. The permanent partial disability of 2.75 [percent] of the whole person would be equal to only 10.71 weeks of compensation ..."—far below the thirty-two weeks required by HRS § 386–33(b). Accordingly, we hold that the Board did not err when it concluded that Claimant's permanent total disability benefits should not be apportioned with the SCF.

**B.**

In the alternative, Employer and Adjuster contend that, pursuant to the "odd-lot" doctrine, Claimant's preexisting degenerative conditions added with other odd-lot factors amounted to an award of thirty-two weeks. Because the Board concluded that Claimant was permanently and totally disabled based not only on his rated impairment but also the odd-lot factors of age, education, transferable skills, experience, and suitable gainful employment in the labor market, Employer and Adjuster argue that the determination of a

---

3. Employer and Adjuster cite *Flores v. City and County of Honolulu*, 67 Haw. 663, 701 P.2d 1282 (1985), to support their argument that the mere fact that a previous disability or condition is asymptomatic before the work injury does not preclude apportionment with the SCF. However, *Flores* was decided under HRS § 386–33 prior to the 1982 amendments which introduced the thirty-two week threshold requirement. The purpose of the threshold was "to significantly reduce the total number of cases in which the [SCF] is required to participate," Sen.Stand. Comm.Rep.No. 215, in 1982 Senate Journal, at 1041, by precluding any apportionment with the SCF in which the preexisting permanent partial disability does not reach the required threshold amount.

preexisting disability should also be based upon these odd-lot criteria.

 Under the odd-lot doctrine, an injured employee may be considered permanently and totally disabled if he or she is unable to obtain employment because of work-related permanent partial disability combined with such factors such as age, education, and work experience. *Yarnell v. City Roofing, Inc.*, 72 Haw. 272, 275, 813 P.2d 1386, 1388 (1991). Accordingly, we must determine whether odd-lot doctrine factors should be considered when measuring a claimant's preexisting disability for the purpose of meeting the thirty-two week minimum threshold requirement of HRS § 386–33(b).

We begin by examining the purpose behind this statutory language. In amending HRS § 386–33 and enacting subsection (b), the legislature stated:

> The purpose of this bill is to reduce the cost of administering workers' compensation claims in those cases where the employee before his work injury suffers from a previous disability. While the bill will reduce administrative and legal costs connected with workers' compensation claims, it will not reduce benefits paid to injured employees.

> . . . .

> *Your Committee finds that Section 33 in its existing form contributes to the cost of workers' compensation by introducing uncertainty as to whom should bear liability for work injuries, by encouraging litigation and by encouraging appeals to the Labor and Industrial Relations Appeals Board.*

> The section in its present form requires the director or the Appeals Board as the case may be to make a hypothetical and inherently difficult decision whenever a work injury combines with a previous disability to result in greater permanent partial or in permanent and total disability. In such cases the director or the board must quantify that disability which would have resulted from the injury without the previous disability. Often this determination is extremely difficult. Physicians frequently are unable to quantify the impair-

ment before an injury and often disagree among themselves. Thus a good deal of uncertainty is injected into workers' compensation cases making settlements less likely and promoting costly litigation.

> The existing provisions of Section 33 also contribute to the cost of administering workers' compensation claims by providing a strong incentive to employers to conduct an exhaustive search of the employee's entire medical history in the hope of finding a previous disability. If earlier injuries or health problems are turned up, litigation with the Special Compensation Fund ensues.

> Further, Section 33 presently encourages unnecessary appeals to the appellate board. This occurs because in any particular case at the departmental level, the director is both decision maker and custodian of the Special Commission Fund. Thus it becomes necessary for the employer to appeal the case in order to obtain a disinterested determination of the Fund's liability under Section 33.

> *Your Committee finds that this bill while not eliminating the foregoing problems entirely will substantially reduce them by making two basic amendments to the section.* First, the bill provides a formula for the apportionment of liability between the Special Compensation Fund and the employer patterned after the formula used by the federal government in the Longshoremen's and Harbor Workers' Act. Under the formula, the Employer pays 104 weeks of compensation. Liability beyond that, if any, will thereafter be the responsibility of the fund. This is a less costly and more predictable means of apportioning liability than the hypothetical determination presently required. *Second, the bill establishes that the previous disability reach a minimum threshold level before any liability is imposed on the fund. This should significantly reduce the total number of cases in which the Special Compensation Fund is required to participate.*

Sen.Stand.Comm.Rep. No. 215–82, in 1982 Senate Journal, at 1040–41 (emphases added) (emphasis in original omitted).

In light of the purpose of HRS § 386–33(b), we believe that Employer and Adjuster's reliance on odd-lot factors, i.e., Claimant's age, limited education, and limited transferable skills, for rating a preexisting disability is misplaced.

First, aside from Claimant's age, it would be inaccurate to classify these odd-lot factors as disabilities because in all probability these were the very factors that caused Claimant to remain employed, thus providing Employer with valuable service for seventeen years. In addition, HRS § 386–1 (1985) defines disability as a "loss or impairment of a physical or mental function." According to the plain language of this definition, odd-lot factors such as education and transferable skills cannot be considered impairments of either a physical or mental function for purposes of rating a preexisting disability.

Second, the inclusion of odd-lot factors would only further complicate the already difficult process of rating a preexisting disability. Instead of clarifying workers' compensation laws, odd-lot factors would only serve to confuse the issues, thereby encouraging more litigation concerning which aspects of a claimant's life should be considered in determining a preexisting disability.

Third, and more importantly, the inclusion of odd-lot factors could render the thirty-two week minimum threshold meaningless because any preexisting physical or mental disability, no matter how small, combined with other personal characteristics of the claimant, could amount to a preexisting disability necessary to apportion liability. Therefore, we hold that odd-lot factors cannot be considered in determining whether a preexisting permanent partial disability amounted to an award of thirty-two weeks of compensation for the purposes of HRS § 386–33.

## IV. CONCLUSION

For the reasons discussed above, we affirm the Board's Decision and Order concluding that Claimant's permanent total disability benefits cannot be apportioned with the SCF.